NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| JOAN PRIESTLEY, | ) | |
| | ) | Supreme Court No. S-18322 |
| Appellant, | ) | |
| | ) | Superior Court No. 3AN-20-07499 CI |
| v. | ) | |
| | ) | MEMORANDUM OPINION |
| MUNICIPALITY OF ANCHORAGE, | ) | AND JUDGMENT* |
| | ) | |
| Appellee. | ) | No. 2088 – April 30, 2025 |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Gregory Miller, Judge.

Appearances: Joan Priestley, pro se, Anchorage, Appellant. Quincy H. Arms and Jason A. Thomas, Assistant Municipal Attorneys, and Blair M. Christensen, Municipal Attorney, Anchorage, for Appellee.

Before: Maassen, Chief Justice, and Carney, Borghesan, Henderson, and Pate, Justices.

## I.     INTRODUCTION

The Municipality of Anchorage rezoned a large parcel of land in the Upper Hillside area to allow residential building on smaller lots. A neighboring landowner sued the Municipality, challenging the sufficiency of the rezoning process. The superior court granted summary judgment to the Municipality. Because there are no

---

\*       Entered under Alaska Appellate Rule 214.

genuine issues of material fact and the Municipality was entitled to judgment as a matter of law on all of the neighboring landowner's claims, we affirm the superior court's grant of summary judgment.

## II. FACTS AND PROCEEDINGS

### A. Facts

Big Country Enterprises (BCE), a partnership of several South Anchorage landowners, owned a 77-acre plot of land located in the Upper Hillside area. The parcel was originally zoned as an R-8 district with a 4-acre minimum lot size, but BCE applied to rezone it to R-10, which allows a 1.25-acre minimum lot size.[1] The application process required BCE to present the rezoning proposal to the Hillside Community Council, the Anchorage Planning Department, and the Anchorage Assembly.[2]

BCE presented its application to the Hillside Community Council twice. The first presentation, in February 2018, lasted only 12 minutes, much of which was taken up by BCE's recital of the applicable Anchorage Municipal Code (AMC) zoning requirements, leaving little time for community members' questions. Two months later BCE submitted a written summary of the council meeting and its rezoning application to the Anchorage Planning Department. BCE held another presentation before the Hillside Community Council in May, following which the Council unanimously opposed the proposed rezoning.

That same month the Planning Department opened up public comment on the rezoning application and held a public hearing. The Department's Planning and Zoning Commission then unanimously recommended accepting the application, albeit with a "special limitation" limiting the development to 23 lots.

---

[1] *See* AMC 21.04.020(P)(2)(a) (2018). The lot and site requirements for R-10 districts vary depending on the average lot slope. A parcel with an average lot slope of 20% or less may contain lots as small as 1.25 acres. *Id.*

[2] *See* AMC 21.03.160(D) (2018); AMC 21.03.020(C)(2)(b) (2017).

In February 2019 the Anchorage Assembly held a public hearing on a proposed ordinance enacting the rezoning, after which it concluded public testimony. On March 5 the Assembly publicly debated the rezoning application and held a vote on its passage. Because area landowners had formally objected, the ordinance needed a supermajority vote of eight of the eleven members to pass.[3] It passed 8-3 with two amendments: (1) an amendment to the special limitation that would allow BCE to create two more lots, for 25 lots total, if it complied with the "Hillside Conservation Subdivision" plan, and (2) the inclusion of nine factual findings proposed by Assembly Member John Weddleton. The findings of fact were these: (1) that the ordinance was "consistent with the land use designation in the Hillside District Plan (HDP) and Anchorage 2040 Land Use Plan (LUP)"; (2) that R-10 zoning was appropriate; (3) that the special limitation was "respectful to the surrounding neighborhood"; (4) that the ordinance complied with the purpose and intent statement in AMC 21.03.160; (5) that the ordinance was "consistent with the HDP"; (6) that the development would generate tax revenue for road maintenance services in the Glen Alps Service Area; (7) that the rezoning application process had complied with the public notice requirements in Title 21 of the Code; (8) that the Assembly accepted the Planning and Zoning Commission's findings with regard to the ordinance; and (9) that the limitation on the number of lots in the development "reflect[ed] important community considerations regarding the character of the neighborhood and development constraints." The Assembly also specifically determined that "[t]he benefit to the general welfare is our need for housing of all types."

---

**3** *See* AMC 02.30.070(D)(2)(b) (2018) (requiring supermajority vote for "motion to approve zoning map amendment if the amendment is protested by owners in the area under certain specific circumstances").

**B.     Proceedings**

Neighboring landowner Joan Priestley sued the Municipality on the grounds that the rezoning ordinance violated a number of provisions of the Municipal Code and the Alaska Constitution.[4]  The Municipality moved for summary judgment, arguing that all of her claims failed as a matter of law.

Priestley then moved for leave to amend her complaint.  In the amended complaint she asserted that the ordinance was invalid for a number of reasons:  (1) it failed to comply with AMC 21.03.160(A), which outlines the purpose and scope of the Code's rezoning provisions; (2) the community meetings were inadequate under AMC 21.03.020(C)(6); (3) the addition of the findings of fact at the Assembly meeting required that there be another public hearing under AMC 02.30.050; (4) the ordinance failed to meet the nine rezoning approval criteria listed in AMC 21.03.160(E)(1)-(9); (5) Assembly Member Weddleton had a conflict of interest that he failed to disclose, in violation of AMC 02.30.070 and AMC 01.15.060; (6) the ordinance constituted impermissible spot zoning; and (7) the ordinance violated Priestley's equal protection and due process rights under the Alaska and United States Constitutions.

The superior court granted Priestley's motion to amend her complaint but at the same time granted the Municipality's motion for summary judgment.  The court noted that there were no facts in dispute and that the Municipality had proven it was entitled to judgment as a matter of law on each of Priestley's claims.

Priestley appeals.

---

[4]     Priestley first appealed the ordinance but later brought an original action in superior court.  Under Alaska law, a small-scale rezoning decision is a legislative decision that must be challenged through a direct action rather than an administrative appeal.  *Cabana v. Kenai Peninsula Borough*, 21 P.3d 833, 836 (Alaska 2001).  The superior court dismissed Priestley's administrative appeal as moot for this reason.

## III.  STANDARD OF REVIEW

We review a superior court's grant of summary judgment de novo, "adopting the rule of law that is most persuasive in light of precedent, reason, and policy."[5]  "We will affirm summary judgment if there are no genuine issues of material fact and if the moving party is entitled to judgment as a matter of law."[6]

Courts presume that zoning decisions are valid.[7]  We review questions of fact in zoning decisions for substantial evidence, which is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[8]  "The zoning body's decision shall not be reversed if it is supported by substantial evidence."[9]

## IV.  DISCUSSION

On appeal Priestley raises seven arguments that mirror those she asserted in her amended complaint.  We discuss each in turn.

### A.  The Purpose And Scope Provision Of AMC 21.03.160 Does Not Create Substantive Rights Or Duties.

Priestley argues that a rezoning applicant must show that the proposed rezoning substantially complies with the language of AMC 21.03.160(A), which outlines the purpose and scope of the Code's rezoning section.  She asserts that under AMC 21.03.160(A), a rezoning must be "necessary in light of changed conditions or changes in public policy, or . . . necessary to advance the general welfare of the municipality," and that the ordinance here is invalid because it fails to substantially comply with these purposes.

---

[5]     *State Farm Mut. Auto. Ins. Co. v. Houle*, 269 P.3d 654, 657 (Alaska 2011) (quoting *State Farm Mut. Auto. Ins. Co. v. Dowdy*, 192 P.3d 994, 998 (Alaska 2008)).

[6]     *Balough v. Fairbanks N. Star Borough*, 995 P.2d 245, 254 (Alaska 2000).

[7]     *Luper v. City of Wasilla*, 215 P.3d 342, 345 (Alaska 2009).

[8]     *Id.* (quoting *Balough*, 995 P.2d at 254).

[9]     *Griswold v. City of Homer*, 55 P.3d 64, 67 (Alaska 2002).

Anchorage Municipal Code 21.03.160(A) is entitled "Purpose and scope," and it provides:

> The purpose of rezoning is . . . to make adjustments to the official zoning map that are necessary in light of changed conditions or changes in public policy, or that are necessary to advance the general welfare of the municipality. Rezonings shall not be used as a way to legitimize nonconforming uses or structures, and should not be used when a conditional use, variance, or minor modification could be used to achieve the same result.

The substantive impact of this provision is limited by AMC 21.15.020(B), which provides: "Statements of purpose or intent in this title are provided to guide interpretation and understanding of the legislative intent behind the substantive regulations of this title. Purpose and intent statements are not substantive requirements, but rather provide a context whereby the provisions of this title are understood."[10]

This governing language is plain. Anchorage Municipal Code 21.03.160(A) does not impose substantive obligations on the Municipality or on rezoning applicants "but rather provide[s] a context whereby the provisions of [the rezonings section] are understood." We accordingly look elsewhere in the Code for substantive law. The superior court did not err by granting summary judgment to the Municipality on this claim.

**B.     The Community Council Meetings Satisfied AMC 21.03.020(C).**

Priestley next argues that BCE's presentations to the Hillside Community Council failed to satisfy AMC 21.03.020(C) because they lacked substance and that BCE's written summary of the February 2018 community meeting was insufficient

---

[10]     At the time of BCE's rezoning application process and the Assembly vote, this language was codified at AMC 21.14.020(B).

because it did not describe the presentation's inadequacies.[11] She contends that because the meetings and written summary were inadequate under the Code, the Municipality violated due process when it passed the ordinance.

A community meeting in this context "is an informal opportunity for the developer to inform the surrounding area residents and property owners of the details of a proposed development and application, how the developer intends to meet the standards contained in [Title 21 of the Code], and to receive public comment and encourage dialogue at an early time in the review process."[12] Section .020(C) imposes requirements for the timing and number of these community meetings, the pre-meeting notice, the necessary attendees, and the written summary of the meeting that the applicant must prepare afterward for submission to the Municipality.[13] The written summary must be "[a] summary of concerns, issues, and problems expressed during the meeting(s)," including the substance of those concerns; "[h]ow the applicant has addressed or intends to address" those concerns; and what concerns "the applicant is unwilling or unable to address and why."[14]

Nothing in the record suggests that the community meetings failed to meet the Code's requirements. Although Priestley and other community members may have been dissatisfied with the substance of BCE's presentations and the time provided for questions and answers, this does not amount to a violation of the Code.[15] The truncated

---

[11]     Priestley also argues that the community meetings did not comply with the purpose section of AMC 21.03.020(C). But Title 21's purpose statements do not create substantive rights or duties, as explained above. *See supra* Part IV.A.

[12]     AMC 21.03.020(C)(1) (2017).

[13]     *See* AMC 21.03.020(C)(3)-(6) (2017).

[14]     AMC 21.03.020(C)(6)(d)(i)-(iii) (2017).

[15]     Such deficiencies may, however, give assembly members reason to vote against a rezoning application, as happened here. Assembly Member Eric Croft

February 2018 meeting was followed by another in May, when, as the superior court found, "45 minutes were provided for fielding questions from the community"; Priestley does not allege that anyone was not heard at that second meeting or that there were any community concerns that were never aired. And the written summary provided by BCE following the February 2018 community meeting satisfied the Code's requirements: it listed the questions from community members (several of them from Priestley) and gave BCE's responses.

Priestley correctly observes that BCE failed to provide a written summary of the May community meeting, as the Code required. But Priestley was not prejudiced by this omission; the Hillside Community Council voted unanimously to oppose the rezoning application, so a different, more Code-compliant process could not have worked more to Priestley's advantage. BCE's failure to comply with the Code's requirement regarding a written summary of this second meeting was therefore a harmless omission. The superior court did not err by concluding that the community meeting requirement of AMC 21.03.020(C) was satisfied and that the Municipality was entitled to summary judgment on this claim.

### C. The Two Amendments To The Ordinance Did Not Necessitate Another Public Hearing.

Priestley objects to the Assembly's decision to include two amendments — (1) the special limitation allowing the development of two additional lots under certain circumstances and (2) the findings of fact proposed by Assembly Member Weddleton — in the final version of the ordinance without a new opportunity for public comment. She argues that the findings of fact lacked a legal or factual basis and expanded the scope of the ordinance, thereby meriting a public hearing on the substance

---

commented that although "the number of lots [was] appropriate or right in that range" and "there's a good chance the development works," he would vote against the ordinance because of his dissatisfaction with the public process.

of the ordinance as amended. She further asserts that the lack of opportunity for public participation at this stage violated due process and that the ordinance should be invalidated for that reason.

Alaska Statute 29.25.020 provides that a municipal ordinance "shall be set by the governing body for a public hearing by the affirmative vote of a majority of the votes authorized on the question."[16] During the public hearing, "the governing body shall hear all interested persons wishing to be heard," and "after the public hearing the governing body shall consider the ordinance, and may adopt it with or without amendment."[17] We have determined that "[o]nly those changes to an ordinance which are so substantial as to change its basic character require that the public hearing process be repeated."[18]

Neither of the amendments at issue here changed the ordinance's basic character. The special limitation allowed the development of two additional lots, bringing the total number of lots permitted from 23 to 25; Priestley does not argue that this change meets the substantiality test. As for the factual findings, none of them expanded the ordinance's scope, contrary to Priestley's assertions: rather, they simply explained the Assembly's understanding of why the ordinance complied with municipal policy and law. The superior court did not err by granting summary judgment to the Municipality on this claim.

---

[16]   AS 29.25.020(b)(2).

[17]   AS 29.25.020(b)(5), (6).

[18]   *Liberati v. Bristol Bay Borough*, 584 P.2d 1115, 1119 (Alaska 1978) (analyzing former AS 29.48.150(a)). Although in *Liberati* we relied on a statute that is no longer in effect, "former AS 29.48.150(a) . . . contains language nearly identical to AS 29.25.020(b) with respect to passing amended ordinances." *McCormick v. City of Dillingham*, 16 P.3d 735, 741 n.24 (Alaska 2001).

**D. The Rezoning Complied With The Nine Criteria In AMC 21.03.160(E).**

Priestley next points to AMC 21.03.160(E), which contains nine approval criteria for rezonings. She argues that a rezoning must fully comply with all nine criteria and that the superior court erred when it relied on AMC 21.03.160(F) for the proposition that the Assembly could interpret the nine criteria "with flexibility."

Under AMC 21.03.160(E), "[t]he planning and zoning commission may recommend approval, and the assembly may approve a rezoning, if the rezoning meets all of the [nine] criteria." Section .160(F) further provides that "the approval criteria of subsection E. above may be interpreted with flexibility" within three parameters, none of which is relevant here.[19] "[O]ur precedents require us to read statutes harmoniously, giving effect to every word and provision."[20] Although Priestley argues that the flexibility standard of section .160(F) does not apply, nothing in the language of section .160(E) suggests that there are some circumstances in which the nine criteria must be strictly, rather than flexibly, interpreted. While the rezoning was required to meet all nine criteria, the Assembly had the latitude to interpret each one flexibly in determining whether the ordinance complied with the Code.

---

[19] *See* AMC 21.03.160(F)(1)-(3) (2018) (setting specific parameters for "[a] proposed rezoning that is to a district that does not correspond to the comprehensive plan map" and for a situation "[w]here the location of comprehensive plan map designation boundaries appear[s] generalized or uncertain" and providing that "[i]nterpretation shall not be a basis for cumulative encroachment by incompatible land uses").

[20] *Blake J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 554 P.3d 430, 435 (Alaska 2024) (footnote omitted).

Priestley makes specific arguments regarding criteria 1, 2, and 8.[21] First, she argues that the Municipality has not shown that the rezoning was "in the best interest of the citizens of Anchorage" and would "promote the public health, safety, and general welfare."[22] Second, she argues that the ordinance did not "compl[y] with and conform[] to the comprehensive plan."[23] Finally, she argues that the ordinance "extend[s] or exacerbate[s] a land use pattern that is inconsistent with the comprehensive plan."[24] These criteria are all generally phrased in ways that call on the reasonable judgment of policymakers — in this case the members of the Assembly.[25]

The Assembly made factual findings, based on the recommendation of the Planning and Zoning Commission, for each of the criteria. The superior court noted that the Assembly heard extensive public testimony on the ordinance and that the assembly packet had almost 200 pages of evidence and comments, and the court determined "that the Assembly took a hard look at all nine criteria." The Assembly's

---

[21] Regarding criteria 3, 4, 5, 6, and 7, Priestley asserts that "[p]age limitations [for appellate briefs] preclude adequate explanation why the BCE rezone does not meet the prerequisites" of those criteria. Any argument based on those criteria is waived. *See Peterson v. Ek*, 93 P.3d 458, 464 n.9 (Alaska 2004) ("[E]ven when a pro se litigant is involved, an argument is considered waived when the party cites no authority and fails to provide a legal theory for his or her argument." (internal quotation marks omitted) (citing *A.H. v. W.P.*, 896 P.2d 240, 243 (Alaska 1995); *Gates v. City of Tenakee Springs*, 822 P.2d 455, 460 (Alaska 1991))). Priestley does not mention criterion 9.

[22] AMC 21.03.160(E)(1) (2018).

[23] AMC 21.03.160(E)(2) (2018).

[24] AMC 21.03.160(E)(8) (2018).

[25] *See, e.g.*, *Griswold v. City of Homer*, 556 P.3d 252, 262-63 (Alaska 2024) (explaining that whether certain types of dwelling units are acceptable "has implications for fundamental land use policies like 'the supply and diversity of housing' and 'the protect[ion of] community character' " and therefore "go to the core of the Board's zoning competency, so we apply reasonable basis review to its decisions on these issues" (alteration in original) (footnotes omitted)).

findings of fact related to these criteria have adequate support in the evidence, and we therefore do not second-guess them.[26]

Given the Assembly's role as fact-finder and the flexibility it is expressly granted in interpreting this provision of the Code, we cannot say that the rezoning failed to comply with the nine listed criteria. The superior court properly awarded summary judgment to the Municipality on this claim.

### E. Assembly Member Weddleton Did Not Have A Conflict Of Interest.

Priestley argues that Assembly Member Weddleton had an undisclosed conflict of interest when he voted to pass the ordinance because he received campaign contributions from members of the building industry around the time of the Assembly vote and because he held a fundraiser for Anchorage builders shortly afterward. She does not argue that the campaign contributions were unlawful, but she asserts that Weddleton's actions created the appearance of impropriety and led to a loss of public trust in government officials. Noting that the ordinance required a supermajority of eight votes to pass, she argues that Weddleton's deciding vote for its passage was improper.

Under the version of AMC 01.15.060(D) in effect at the time of the Assembly vote, "[a] public servant shall not participate in an official action in which the public servant . . . has a substantial financial or private interest." To determine whether a financial or private interest is substantial, the former Code required the balancing of six factors: (1) whether the interest "is a substantial part of the matter under consideration," (2) whether the interest "directly and substantially varies with the outcome of the official action," (3) whether the interest "is immediate and known or conjectural and dependent on factors beyond the official action," (4) whether the interest "is significant monetarily," (5) whether the interest "is of a type which is

---

[26]     *See Luper v. City of Wasilla*, 215 P.3d 342, 345 (Alaska 2009).

generally possessed by the public or a large class of persons to which the member belongs," and (6) "[o]ther factors deemed appropriate by the presiding official under the specifics of the disclosure and the nature of the action."[27]

We have concluded that a substantial financial interest exists where a government official has "a 'narrow and specific interest' in the immediate subject" of an official action.[28] "[T]he proper focus is on the relationship between the official's financial interest and the result of the official's action, 'regardless of the official's intent.' "[29] Under the former Code, if an elected official has a financial or private interest that may be substantial, the official must "disclose the nature of the interest in sufficient detail to permit the other members of the body to determine if the interest is substantial."[30] The disclosure must occur "[p]rior to comment, deliberation, or decision on a matter coming before the body" to which the elected official belongs.[31]

We conclude that Assembly Member Weddleton's fundraising activities did not mean that he had a substantial financial or private interest in the outcome of the vote, and he was therefore not required to disclose any conflict to the Assembly beforehand. Importantly, there is no evidence that he had any private interest in BCE or this particular development; his only apparent interest was the public one of an elected assembly member who favored the expansion of residential construction. That

---

[27] AMC 01.15.060(E)(1)-(6) (2018). The current iteration of the Code requires the balancing of only two factors: "size" and "connection." *See* AMC 01.15.060(D)(2)(a)-(b) (2023).

[28] *Griswold v. City of Homer*, 34 P.3d 1280, 1287 (Alaska 2001).

[29] *Griswold v. City of Homer* (*Griswold I*), 925 P.2d 1015, 1026 (Alaska 1996) (quoting *Carney v. State, Bd. of Fisheries*, 785 P.2d 544, 548 (Alaska 1990)).

[30] AMC 01.15.060(F)(2)(a) (2018); *see also* AMC 02.30.070(A) (2018) ("No member of the assembly may vote or participate in any official action of the assembly on any question in violation of Chapter 1.15.").

[31] AMC 01.15.060(F)(2)(a) (2018).

Weddleton had publicly stated policy positions and engaged in fundraising in order to achieve and remain in elected office did not convert his public interest into a private one.

Even assuming that this circumstance shows a financial interest in the expansion of Anchorage homebuilding, it was of low significance in both amount and personal importance, and it was not immediately tied to the ordinance under consideration. At the time that the vote took place, Weddleton was running unopposed to retain his seat on the Assembly. In the first two weeks of March, he raised less than $6,000 from Anchorage homebuilders for this uncontested election. The link between his fundraising activities and the Assembly's vote is attenuated at best. There is no evidence that he raised money on the specific promise that he would vote for the ordinance at issue, nor is there evidence that members of BCE contributed to his campaign or attended the fundraiser that Priestley flags as significant. In short, Weddleton's interest is neither narrow nor specific, and there is no strong connection between his interest and the result of the vote.

Because there is no evidence of a conflict of interest requiring disclosure to the Assembly, the superior court did not err by granting summary judgment to the Municipality on this claim.

**F.    The Ordinance Did Not Constitute Illegal Spot Zoning.**

Priestley argues that her amended complaint sufficiently alleged that the ordinance constituted illegal "spot zoning." "[S]pot zoning is 'the process of singling out a small parcel of land for a use classification totally different from that of the surrounding area, for the benefit of the owner of such property and to the detriment of other owners.' "[32] In *Griswold I* we said that when a court is deciding whether an

---

[32]    *Griswold I*, 925 P.2d at 1020 (quoting 1 ROBERT M. ANDERSON, AMERICAN LAW OF ZONING 3D § 5.12, at 359 (1986)).

ordinance constitutes spot zoning, it must consider "(1) the consistency of the amendment with the comprehensive plan; (2) the benefits and detriments of the amendment to the owners, adjacent landowners, and community; and (3) the size of the area 'rezoned.' "[33] We noted that "[p]erhaps the most important factor in determining whether a small-parcel zoning amendment will be upheld is whether the amendment provides a benefit to the public, rather than primarily a benefit to a private owner."[34]

Priestley focuses her argument on the second factor: the benefits and detriments of the rezoning. She argues that "Anchorage has no need for denser housing development in the Hillside area" as shown by her "detailed and consistent, objective evidence." But the Assembly found otherwise, based on the recommendations of the Planning and Zoning Commission, determining both that the ordinance was consistent with area and municipality-wide land use plans and that increased "housing of all types" would benefit the general public. There is significant evidentiary support for these findings in the public testimony and letters supporting the rezoning, particularly from residents hoping to find smaller, more affordable lots in the Hillside area.

As reflected in our discussion of the rezoning criteria in AMC 21.03.160(E), above, we conclude that the Assembly appropriately considered the benefits and detriments of the proposed rezoning and reached a decision, sufficiently supported by the evidence, that the rezoning benefited the public. The superior court did not err by granting summary judgment to the Municipality on Priestley's spot zoning claim.

---

[33] *Id.*

[34] *Id.* at 1022.

**G.** **Priestley Did Not State Viable Due Process Or Equal Protection Claims.**

Priestley argues that the improper passage of the ordinance violated her equal protection and due process rights. She further argues that the rights at stake are fundamental rights and that the Assembly's actions should therefore be subject to strict scrutiny.

We conclude that Priestley has not sufficiently demonstrated a violation of either due process or equal protection. The due process clause of the Alaska Constitution protects against any "depriv[ation] of life, liberty, or property, without due process of law."[35] The clause contains both procedural and substantive components.[36] To determine if procedural due process has been violated, courts consider three factors: (1) "the private interest that will be affected by the official action; [(2)] the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and [(3)] the Government's interest."[37] As for substantive due process, "a legislative body's zoning decision violates substantive due process if it has no reasonable relationship to a legitimate government purpose."[38]

---

[35] Alaska Const. art. I, § 7.

[36] *Doe v. State, Dep't of Pub. Safety*, 444 P.3d 116, 124-25 (Alaska 2019).

[37] *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976); *see also Griswold v. City of Homer*, 252 P.3d 1020, 1029 (Alaska 2011) ("The test for deprivations of procedural due process under both the Alaska Constitution and the United States Constitution is the test outlined in *Mathews v. Eldridge*." (footnotes omitted)).

[38] *Griswold I*, 925 P.2d at 1019; *see also Lewis v. Brown*, 409 F.3d 1271, 1273 (11th Cir. 2005) ("Where an individual's state-created rights are infringed by 'legislative act,' the substantive component of the [Fourteenth Amendment's] Due Process Clause generally protects him from arbitrary and irrational action by the government.").

The superior court correctly concluded that Priestley has not shown that the Assembly's action deprived her of either procedural or substantive due process. She has not identified a liberty or property interest of which she was deprived during the rezoning process, nor has she demonstrated that the ordinance, which allowed for more housing development in the Hillside area, bore no reasonable relationship to the legitimate government purpose of expanding housing opportunities for Anchorage residents.

The Alaska Constitution's equal protection clause provides "that all persons are equal and entitled to equal rights, opportunities, and protection under the law."[39] An equal protection claimant must demonstrate that the challenged government action treats two similarly situated groups of people unequally.[40] Here, Priestley has not shown that she experienced any improper classification or unequal treatment as a result of the ordinance. Her equal protection claim thus fails.

The superior court correctly determined that the Municipality was entitled to judgment as a matter of law with regard to Priestley's due process and equal protection claims, and summary judgment for the Municipality was proper.

## V. CONCLUSION

The judgment of the superior court is AFFIRMED.

---

[39] Alaska Const. art. I, § 1.

[40] *See Pub. Emps.' Ret. Sys. v. Gallant*, 153 P.3d 346, 349 (Alaska 2007); *Native Vill. of Kwinhagak v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 542 P.3d 1099, 1117 (Alaska 2024) (concluding that "equal protection claim fails at the first step because there is no unequal treatment"); *see also King v. Pebler*, 362 F. App'x 872, 873 (9th Cir. 2010) (concluding that trial court properly dismissed inmate's equal protection claim under United States Constitution because "he failed to allege facts showing that he was treated differently from other inmates who were similarly situated and that there was no rational basis for the difference in treatment").